## MERCOID CORPORATION *v.* MID-CONTINENT INVESTMENT CO. ET AL.

Nos. 54 and 55. Argued December 9, 1943.—Decided January 3, 1944.

*Mr. George L. Wilkinson* for petitioner.

*Mr. Casper W. Ooms,* with whom *Messrs. Richard Spencer, Richard L. Johnston,* and *Lloyd C. Root* were on the brief, for the Mid-Continent Investment Co.; and

*Mr. W. P. Bair,* with whom *Messrs. Will Freeman* and *George H. Fisher* were on the brief, for the Minneapolis-Honeywell Regulator Co.,—respondents.

*Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Elliott H. Moyer* and *Robert C. Barnard* filed a brief on behalf of the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This suit was brought by respondent, Mid-Continent Investment Co., against petitioner, Mercoid Corporation, for contributory infringement of the Cross combination patent No. 1,758,146, issued May 13, 1930, for a domestic heating system. Mercoid in its answer denied contributory infringement and alleged that Mid-Continent should be barred from relief because it was seeking to extend the grant of the patent to unpatented devices. The alleged improper use of the patent was also the basis of a counterclaim filed by Mercoid in which it was averred that Mid-Continent and its exclusive licensee under the patent, respondent Minneapolis-Honeywell Regulator Co., who was brought in as a party plaintiff, had conspired to expand the monopoly of the patent in violation of the anti-trust laws. Mercoid asked not only for declaratory relief but for an accounting and treble damages as well. The District Court found that Mercoid did not contribute to the infringement of the Cross patent; that respondents had conspired to establish a monopoly in an unpatented appliance beyond the scope of the patent and in violation of the anti-trust laws; and that respondents were in no position to maintain the suit because of that conspiracy. Mercoid was granted an injunction but its prayer for damages was denied. The Circuit Court of Appeals affirmed the judgment of the District Court in disallowing dam-

ages under the counterclaim. In all other respects it reversed that judgment, holding that Mercoid was guilty of contributory infringement under the rule of *Leeds & Catlin Co.* v. *Victor Talking Machine Co.* (No. 2), 213 U. S. 325, and that *Carbice Corp.* v. *American Patents Corp.*, 283 U. S. 27 and *Leitch Mfg. Co.* v. *Barber Co.*, 302 U. S. 458, did not bar recovery as the District Court had thought. 133 F. 2d 803. The case is here on a petition for a writ of certiorari which we granted because of the public importance of the questions presented.

The controversy centers around the license agreement between Mid-Continent and Minneapolis-Honeywell. By that agreement Minneapolis-Honeywell received an exclusive license to make, use, sell, and to sub-license others to make, use, and sell the Cross combination patent No. 1,758,146. The royalty payments under the license, however, were to be based only upon sales of the combustion stoker switch which was an element of the combination patent embodied in the patented article but which was itself unpatented. The license agreement was construed by the Circuit Court of Appeals to mean that the royalty payments were to be made only on switches used for fire maintenance purposes under the Cross patent. And Minneapolis-Honeywell in advertising its stoker switches stated that the "right to use" the Cross system patent was "only granted to the user" when the stoker switches of Minneapolis-Honeywell were purchased from it and used in the system. Neither Mid-Continent nor Minneapolis-Honeywell manufactures or installs heating systems under the Cross combination patent. There was ample evidence to sustain the findings of the District Court that respondents endeavored to use the license agreement so as to prevent the sale or use of combustion stoker switches in these heating systems unless they were the switches made by Minneapolis-Honeywell and purchased from it or its sub-licensees.

The patent is a combination or system patent, covering a domestic heating system which comprises three main elements—a motor driven stoker for feeding fuel to the combustion chamber of a furnace, a room thermostat for controlling the feeding of fuel, and a combustion stoker switch to prevent extinguishment of the fire. The room thermostat functions to supply, or discontinue the supply of, heat by closing or then opening the circuit to the stoker motor at the required temperatures. The combustion stoker switch, or holdfire control, is responsive to a low temperature in the furnace causing the stoker to feed fuel so as to prevent the furnace fire from going out. The control of the combustion stoker switch is said to be effective in mild weather when the room thermostat may not call for heat for a considerable period.

Mercoid, like Mid-Continent and Minneapolis-Honeywell, does not sell or install the Cross heating system. But the Circuit Court of Appeals found that Mercoid manufactured and sold combustion stoker switches for use in the Cross combination patent. And we may assume that Mercoid did not act innocently. Indeed the Circuit Court of Appeals said that it could find no use for the accused devices other than in the Cross combination patent. And it assumed, as was held in *Smith* v. *Mid-Continent Investment Co.,* 106 F. 2d 622, that the Cross patent was valid. But though we assume the validity of the patent and accept fully the findings of the Circuit Court of Appeals, we think the judgment below should be reversed.

Ever since *Henry* v. *A. B. Dick Co.,* 224 U. S. 1, was overruled by *Motion Picture Co.* v. *Universal Film Co.,* 243 U. S. 502, this Court has consistently held that the owner of a patent may not employ it to secure a limited monopoly of an unpatented material used in applying the invention. *Carbice Corp.* v. *American Patents Corp., supra; Leitch Mfg. Co.* v. *Barber Co., supra; Morton Salt*

*Co.* v. *G. S. Suppiger Co.,* 314 U. S. 488; *B. B. Chemical Co.* v. *Ellis,* 314 U. S. 495. In those cases both direct and contributory infringement suits were disallowed on a showing that the owner of the patent was using it "as the effective means of restraining competition with its sale of an unpatented article." *Morton Salt Co.* v. *G. S. Suppiger Co., supra,* p. 490. The Court has repeatedly held that to allow such suits would be to extend the aid of a court of equity in expanding the patent beyond the legitimate scope of its monopoly. It is true that those cases involved the use of the patent for a machine or process to secure a partial monopoly in supplies consumed in its operation or unpatented materials employed in it. But we can see no difference in principle where the unpatented material or device is itself an integral part of the structure embodying the patent.

The grant of a patent is the grant of a special privilege "to promote the Progress of Science and useful Arts." Const., Art. I, § 8. It carries, of course, a right to be free from competition in the practice of the invention. But the limits of the patent are narrowly and strictly confined to the precise terms of the grant. *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 456; *United States* v. *Univis Lens Co.,* 316 U. S. 241, 251. It is the public interest which is dominant in the patent system. *Pennock* v. *Dialogue,* 2 Pet. 1; *Kendall* v. *Winsor,* 21 How. 322, 329; *Adams* v. *Burke,* 17 Wall. 453; *Motion Picture Co.* v. *Universal Film Co., supra,* pp. 510–511; *Morton Salt Co.* v. *G. S. Suppiger Co., supra; United States* v. *Masonite Corp.,* 316 U. S. 265, 278. It is the protection of the public in a system of free enterprise which alike nullifies a patent where any part of it is invalid (*Marconi Wireless Co.* v. *United States,* 320 U. S. 1, 58; and see *General Electric Co.* v. *Wabash Corp.,* 304 U. S. 364, 372) and denies to the patentee after issuance the power to use it in such a way as to acquire a monopoly which is not plainly within .

the terms of the grant. The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly. The fact that the patentee has the power to refuse a license does not enable him to enlarge the monopoly of the patent by the expedient of attaching conditions to its use. *United States* v. *Masonite Corp., supra,* p. 277. The method by which the monopoly is sought to be extended is immaterial. *United States* v. *Univis Lens Co., supra,* pp. 251–252. The patent is a privilege. But it is a privilege which is conditioned by a public purpose. It results from invention and is limited to the invention which it defines. When the patentee ties something else to his invention, he acts only by virtue of his right as the owner of property to make contracts concerning it and not otherwise. He then is subject to all the limitations upon that right which the general law imposes upon such contracts. The contract is not saved by anything in the patent laws because it relates to the invention. If it were, the mere act of the patentee could make the distinctive claim of the patent attach to something which does not possess the quality of invention. Then the patent would be diverted from its statutory purpose and become a ready instrument for economic control in domains where the anti-trust acts or other laws not the patent statutes define the public policy.

The instant case is a graphic illustration of the evils of an expansion of the patent monopoly by private engagements. The patent in question embraces furnace assemblies which neither the patentee nor the licensee makes or vends. The struggle is not over a combination patent and the right to make or vend it. The contest is solely over unpatented wares which go into the patented product. Respondents point out that the royalties under the license are measured by the number of unpatented controls which are sold and that no royalty is paid unless a furnace cov-

ered by the patent has been installed. But the fact remains that the competition which is sought to be controlled is not competition in the sale of the patented assembly but merely competition in the sale of the unpatented thermostatic controls. The patent is employed to protect the market for a device on which no patent has been granted. But for the patent such restraint on trade would plainly run afoul of the anti-trust laws. If the restraint is lawful because of the patent, the patent will have been expanded by contract. That on which no patent could be obtained would be as effectively protected as if a patent had been issued. Private business would function as its own patent office and impose its own law upon its licensees. It would obtain by contract what letters patent alone may grant. Such a vast power "to multiply monopolies" at the will of the patentee (Chief Justice White dissenting in *Henry v. A. B. Dick Co., supra,* p. 53) would carve out exceptions to the anti-trust laws which Congress has not sanctioned. Mr. Justice Brandeis, speaking for the Court, stated in the *Carbice* case that "Control over the supply of such unpatented material is beyond the scope of the patentee's monopoly; and this limitation, inherent in the patent grant, is not dependent upon the peculiar function or character of the unpatented material or on the way in which it is used." 283 U. S. p. 33. We now add that it makes no difference that the unpatented device is part of the patented whole.

That result may not be obviated in the present case by calling the combustion stoker switch the "heart of the invention" or the "advance in the art." The patent is for a combination only. Since none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by the patent monopoly. *Leeds & Catlin Co.* v. *Victor Talking Machine Co.* (No. 1), 213 U. S. 301, 318. Whether the parts are new or old, the combination is the in-

vention and it is distinct from any of them. See *Schumacher* v. *Cornell,* 96 U. S. 549, 554; *Rowell* v. *Lindsay,* 113 U. S. 97, 101. If a limited monopoly over the combustion stoker switch were allowed, it would not be a monopoly accorded inventive genius by the patent laws but a monopoly born of a commercial desire to avoid the rigors of competition fostered by the anti-trust laws. If such an expansion of the patent monopoly could be effected by contract, the integrity of the patent system would be seriously compromised.

*Leeds & Catlin Co.* v. *Victor Talking Machine Co.* (No. 2), *supra,* is authority for the conclusion that he who sells an unpatented part of a combination patent for use in the assembled machine may be guilty of contributory infringement. The protection which the Court in that case extended to the phonograph record, which was an unpatented part of the patented phonograph, is in substance inconsistent with the view which we have expressed in this case. The rule of the *Leeds & Catlin* case (No. 2) accordingly must no longer prevail against the defense [1] that a combination patent is being used to protect an unpatented part from competition. That result obtains here though we assume for the purposes of this case that Mercoid was a contributory infringer and that respondents could have enjoined the infringement had they not misused the patent for the purpose of monopolizing unpatented material. Inasmuch as their misuse of the patent would have precluded them from enjoining a direct infringement (*Mor-*

---

[1] The Court in that case did not refer to the doctrine of misuse of a patent. That doctrine indeed was developed in this Court some years later as shown by the *Motion Picture* case. The record in the *Leeds & Catlin* case indicates that the point which we deem crucial in the instant case was adverted to only obliquely in the briefs. The Court was chiefly concerned with the proposition that a substitution or renewal of an unpatented element of a combination patent, as distinguished from its repair, is a "reconstruction" of the combination. 213 U. S. pp. 333, 336.

*ton Salt Co.* v. *G. S. Suppiger Co., supra*) they cannot stand in any better position with respect to a contributory infringer. Where there is a collision between the principle of the *Carbice* case and the conventional rules governing either direct or contributory infringement, the former prevails.

The result of this decision, together with those which have preceded it, is to limit substantially the doctrine of contributory infringement. What residuum may be left we need not stop to consider. It is sufficient to say that in whatever posture the issue may be tendered courts of equity will withhold relief where the patentee and those claiming under him are using the patent privilege contrary to the public interest. *Morton Salt Co.* v. *G. S. Suppiger Co., supra,* p. 492.

There remain the questions of *res judicata* and Mercoid's right to relief under the counterclaim.

Respondents point out that Mercoid knew of Mid-Continent's actions and the license agreement prior to 1935 when the earlier suit involving the validity of the Cross patent (*Smith* v. *Mid-Continent Investment Co., supra*) was instituted. They state, and the District Court found, that although Mercoid was not made a party to the earlier suit it provided the defense. The contention therefore is that the doctrine of *res judicata* binds Mercoid as respects issues which were actually litigated and all issues which might have been raised in that earlier suit. And it is pointed out that among the defenses which might have been interposed were those relating to the misuse of the patent and the violations of the anti-trust laws. It is argued, moreover, that although Minneapolis-Honeywell was not a party to the earlier litigation, it is entitled to the benefit of the judgment since its title or claim derives from the patentee. We do not stop to examine the premises on which the argument is based; for though we assume that they are correct, it does not follow that the

doctrine of *res judicata* forecloses the defense which is tendered.

Respondents ask the equity court for an injunction against infringement by petitioner of the patent in question and for an accounting. Should such a decree be entered, the Court would be placing its imprimatur on a scheme which involves a misuse of the patent privilege and a violation of the anti-trust laws. It would aid in the consummation of a conspiracy to expand a patent beyond its legitimate scope. But patentees and licensees cannot secure aid from the court to bring such an event to pass, "unless it is in accordance with policy to grant that help." *Beasley* v. *Texas & Pacific Ry. Co.,* 191 U. S. 492, 497. And the determination of that policy is not "at the mercy" of the parties (*id.,* p. 498) nor dependent on the usual rules governing the settlement of private litigation. "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515, 552. "Where an important public interest would be prejudiced," the reasons for denying injunctive relief "may be compelling." *Harrisonville* v. *Dickey Clay Co.,* 289 U. S. 334, 338. And see *United States* v. *Morgan,* 307 U. S. 183, 194. That is the principle which has led this Court in the past to withhold aid from a patentee in suits for either direct or indirect infringement where the patent was being misused. *Morton Salt Co.* v. *G. S. Suppiger Co., supra,* p. 492. That principle is controlling here. The parties cannot foreclose the courts from the exercise of that discretion by the failure to interpose the same defense in an earlier litigation. Cf. *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173.

What we have just said does not, of course, dispose of Mercoid's counterclaim for damages. That was based

on § 4 of the Clayton Act which provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 38 Stat. 731, 15 U. S. C. § 15. Though Mercoid were barred in the present case from asserting any defense which might have been interposed in the earlier litigation, it would not follow that its counterclaim for damages would likewise be barred. That claim for damages is more than a defense; it is a separate statutory cause of action. The fact that it might have been asserted as a counterclaim in the prior suit by reason of Rule 13 (b) of the Rules of Civil Procedure does not mean that the failure to do so renders the prior judgment *res judicata* as respects it. *Virginia-Carolina Chemical Co.* v. *Kirven*, 215 U. S. 252; *Larsen* v. *Northland Transportation Co.*, 292 U. S. 20. And see Scott, Collateral Estoppel by Judgment, 56 Harv. L. Rev. 1, 26–28; Restatement of the Law of Judgments, § 58. The case is then governed by the principle that where the second cause of action between the parties is upon a different claim the prior judgment is *res judicata* not as to issues which might have been tendered but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." *Cromwell* v. *County of Sac*, 94 U. S. 351, 353. And see *Russell* v. *Place*, 94 U. S. 606. It was held in *Fleitmann* v. *Welsbach Street Lighting Co.*, 240 U. S. 27, that the statutory liability in question may be enforced only through the verdict of a jury in a court of common law. But there is no reason under the Rules of Civil Procedure why that may not be done under this counterclaim. Rules 12 (h), 13, 38, 42 (b). Whether the evi-

dence will show damages within the rule of *Story Parchment Co.* v. *Paterson Co.*, 282 U. S. 555, is of course a distinct question on which we intimate no opinion.

We have mentioned the statutory claim for damages because both the District Court and the Circuit Court of Appeals denied that relief. But since the cause must be remanded to the District Court, we think the question whether *res judicata* bars any other part of the relief sought by the counterclaim may appropriately be reserved for it.

*Reversed.*

Opinion of MR. JUSTICE BLACK:

Although I entirely agree with the Court's judgments and the grounds on which they rest, I find it necessary to add a few remarks in order that silence may not be understood as acquiescence in the views expressed in the dissenting opinion of MR. JUSTICE FRANKFURTER. There is no inclination on my part to challenge the wisdom of the established practice whereby we do not discuss issues in the abstract. As I see it, that salutary practice has no application to the Court's discussion of contributory infringement in the present case. The court below rested its decision on what it considered to be a doctrine of contributory infringement, and counsel for respondent have discussed and relied upon it here. The Court's opinion demonstrates that the subject cannot be ignored since at least one element of the "complicated idea" which is "compressed" in the judicially created "formula" of contributory infringement clashes head-on with elements of the *Carbice* doctrine.

But my disagreement with this dissenting opinion runs much deeper than the mere question of whether the Court has here discussed the so-called formula of contributory infringement at an improper or inopportune time. It seems to me that the judicial error of discussing abstract

questions is slight compared to the error of interpreting legislative enactments on the basis of a court's preconceived views on "morals" and "ethics."

If there is such a wrong as contributory infringement, it must have been created by the federal patent statutes. Since they make no direct mention of such a wrong, its existence could only be rested on inferences as to Congressional intent. In searching for Congressional intent we ordinarily look to such sources as statutory language and legislative history. The dissent in question mentions neither of these guides; in fact, it mentions no statute at all. Instead, the chief reliance appears to be upon the law of torts, a quotation from a decision of a lower federal court which held that no infringement was shown, and the writer's personal views on "morals" and "ethics." Not one of these references, unless it be the latter, throws enough light on the patent statutes to justify its use in construing these statutes as creating, in addition to a right of recovery for infringement, a more expansive right judicially characterized as a "formula" of "contributory infringement." And for judges to rest their interpretation of statutes on nothing but their own conceptions of "morals" and "ethics" is, to say the least, dangerous business.

If the present case compelled consideration of the morals and ethics of contributory infringement, I should be most reluctant to conclude that the scales of moral value are weighted against the right of producers to sell their unpatented goods in a free market. At least since Adam Smith wrote, unhampered competition has not generally been considered immoral. While there have been objections to the Sherman Anti-Trust Act, few if any of the objectors have questioned its morality.

It has long been recognized that a socially undesirable practice may seek acceptance under the guise of conventional moral symbols. And repeated judicial assertion

that a bad practice is hallowed by morals may, if unchallenged, help it to receive the acceptance which it seeks. With this in mind, I wish to make explicit my protest against talking about the judicial doctrine of "contributory infringement" as though it were entitled to the same respect as a universally recognized moral truth.

Mr. Justice Murphy concurs in this opinion.

Mr. Justice Roberts:

*First.* I agree that the patentee may not extend his exclusive statutory right to make, use, and vend by forbidding one practicing the invention from using in such practice an unpatented article susceptible to such use. He may not obtain an injunction against such user for infringement. This is a pure question of the extent of the right of exclusion conferred by the patent statute.[1] It nowise involves the antitrust acts. A patent is property and it may, like other property, be so used as to violate those acts,[2] but that is not this case.

*Second.* I think the opinion may create confusion respecting contributory infringement. The court below, thinking the doctrine of the *Carbice* and *Leitch* cases inapplicable, necessarily concluded that the user of the system infringed the patent if he used any thermostat other than that manufactured by respondent's exclusive licensee. But those cases show that so to do would not constitute infringement of the patent. And if the purchaser and user could not be amerced as an infringer certainly one who sold to him with the purpose that he should use the thermostat cannot be amerced for contributing to a non-existent infringement. One may disagree with the

---

[1] *Carbice Corp. v. American Patents Corp.*, 283 U. S. 27; *Leitch Mfg. Co. v. Barber Co.*, 302 U. S. 458.

[2] *Standard Sanitary Mfg. Co. v. United States*, 226 U. S. 20; *United States v. Masonite Corp.*, 316 U. S. 265.

decision of this court in *Leeds & Catlin Co.* v. *Victor Talking Machine Co.* (No. 2), 213 U. S. 325, that the substitution by the user of the talking machine of a record not made by the licensor constituted an infringement of the patent, but, accepting the premise that such conduct was infringement, one who participated in it by knowingly and intentionally selling records to the user became an aider and participant in the infringement and, as such, liable to the owner of the patent. I cannot believe that the court's opinion is intended to lay down a different principle.

*Third.* I disagree with the application of the rule *res judicata* to one phase of the litigation. Mercoid defended an earlier suit brought by the respondent against a user of the patented combination who bought and installed as part of the system a Mercoid thermostat. Confessedly the defense now asserted under the *Carbice* doctrine was available, was not made, and judgment of validity and infringement was entered.

I fail to see what great question of public interest or public policy is violated by holding that one to whom a defense was available, in rebuttal of a claim broader than was warranted by the statute on which the plaintiff's right was founded, is bound by the judgment rendered. That judgment stands unreversed. The defense, if made, as it could have been, would have benefited the defendant in its pocketbook. We are now told that a misconstruction of the patent law by a licensor is so violent and flagrant a flouting of the public interest that a court of equity must hold its hand for the benefit of a defendant whenever he chooses to invoke that interest for his private benefit, though he has failed to make the defense in an earlier litigation and stands of record an infringer. If a wrong against the public has been perpetrated it may be redressed at the instance of the representatives of government.

I can only speculate as to the results of such a holding. If applicable here, I cannot see why the principle should not apply to every suit or action based upon, or arising out of, statutory provisions, and to every defense bottomed on public policy, whether expressed in statute or not. Surely the defendant in the earlier suit, after the decree against him became final, could not have defended a charge of contempt for disobeying the decree on the ground now asserted. And if the judgment concluded him thus directly, I cannot agree that he may now disregard it or collaterally attack it. And confessedly Mercoid stands in his shoes.[3]

I should affirm the judgment.

Mr. Justice Reed joins in this opinion.

Mr. Justice Frankfurter, dissenting:

The Court holds in effect that the owner of a patent who exacts, as the condition of a license, that unpatented materials used in connection with the invention shall be purchased only from the licensor cannot obtain relief from equity against one who supplies such unpatented materials even though the unpatented appliance was not for common use but was designedly adapted for the practice of the invention, but when so used did not involve an infringement of the patent. The decision is thus merely an appropriate application of what has come to be known as the doctrine in the *Carbice* case, 283 U. S. 27. In this view I concur.

But in the series of cases in which that doctrine has heretofore been applied (*Motion Picture Co.* v. *Universal Film Co.,* 243 U. S. 502; *Carbice Corp.* v. *American Patents Corp., supra; Morton Salt Co.* v. *Suppiger Co.,* 314

---

[3] *Bryant Electric Co.* v. *Marshall,* 169 F. 426; affirmed 185 F. 499. Compare *Souffront* v. *La Compagnie,* 217 U. S. 475. And see cases collected 139 A. L. R. 41.

U. S. 488; *B. B. Chemical Co.* v. *Ellis,* 314 U. S. 495), not once has this Court found it relevant to reject, either explicitly or by indirection, another doctrine of the law, that of contributory infringement, nor has it seen fit to make animadversions upon it. This is so doubtless for the simple reason that appropriate occasions for relief against contributory infringement are unrelated to the circumstances which bring the *Carbice* doctrine into play. In a word, if there is no infringement of a patent there can be no contributory infringer.

Within its true limits the idea of contributory infringement was woven into the fabric of our law and has been part of it for now more than seventy years. See Roberts, *Contributory Infringement of Patent Rights,* 12 Harv. L. Rev. 35, and e. g. *Thomson-Houston Electric Co.* v. *Ohio Brass Co.,* 80 F. 712. The doctrine has been put perhaps most simply by Judge Shepley: "Different parties may all infringe, by respectively making or selling, each of them, one of the elements of a patented combination, provided those separate elements are made for the purpose, and with the intent, of their being combined by a party having no right to combine them. But the mere manufacture of a separate element of a patented combination, unless such manufacture be proved to have been conducted for the purpose, and with the intent of aiding infringement, is not, in and of itself, infringement." *Saxe* v. *Hammond,* Fed. Cas. No. 12,411, 1 Ban. & A. 629, 632. So understood, the doctrine of contributory infringement is an expression both of law and morals. It is but one phase of a more comprehending doctrine of legal liability enforced by this Court both in civil and criminal cases. See, for instance, *American Bank & Trust Co.* v. *Federal Reserve Bank,* 256 U. S. 350, and *Direct Sales Co.* v. *United States,* 319 U. S. 703. Indeed, the opinion in the *Carbice* case explicitly recognizes a proper scope for the doctrine of contributory infringement as a phase of the

law of torts: "Infringement, whether direct or contributory, is essentially a tort, and implies invasion of some right of the patentee." *Carbice Corp.* v. *American Patents Corp.*, 283 U. S. 27, 33.

To be sure, the doctrine of contributory infringement may be misconceived and has been misapplied. That is the fate of all shorthand statements of complicated ideas, whether in law or in the natural sciences. But the misapplication of a formula into which a complicated idea is compressed and thereby mutilated is a poor excuse for rejecting the idea. It will be time enough to define the appropriate limits of the doctrine of contributory infringement when we are required to deal with the problem. Until then litigants and lower courts ought not to be embarrassed by gratuitous innuendoes against a principle of the law which, within its proper bounds, is accredited by legal history as well as ethics. The long and on the whole *not unworthy history of our judicial administration* admonishes us against expressing views on matters not before us. The history of this Court especially admonishes us against the evils of giving opinions not called for. See *e. g.* Hughes, *The Supreme Court of the United States,* p. 50, and 49 Harv. L. Rev. 68, 98. The duty of not going beyond the necessities of a case is not a lifeless technicality. The experience of centuries is behind the wisdom of not deciding, whether explicitly or by atmospheric pressure, matters that do not come to the Court with the impact of necessity.

For the reasons set forth by my brother ROBERTS, *res judicata* calls for affirmance.

MR. JUSTICE JACKSON, in dissent:

"A patent," said Mr. Justice Holmes, "is property carried to the highest degree of abstraction—a right *in rem* to exclude, without a physical object or content." [1]    Here the

---

[1] I Holmes-Pollock Letters, p. 53.

patent covers a combination—a system—a sequence—which is said to be new, although every element and factor in it is old and unpatentable. Thus we have an abstract right in an abstruse relationship between things in which individually there is no right—a legal concept which either is very profound or almost unintelligible, I cannot be quite sure which.

Undoubtedly the man who first devised a thermostat to control the flow of electric energy gave something to the world. But one who merely carried it to a new location, or used two instead of one, or three instead of two, or used it to control current for a stoker motor rather than for a damper, did not do much that I would not expect of a good mechanic familiar with the instrument. But that question of validity is not here. I assume that this patent confers some rights and ask what they are.

Of course the abstract right to the "sequence" has little economic importance unless its monopoly comprehends not only the arrangement but some, at least, of its components. If the patentee may not exclude competitors from making and vending strategic unpatented elements such as the thermostat, adapted to use in the combination, the patented system is so vulnerable to competition as to be almost worthless. On the other hand, if he may prohibit such competition, his system patent gathers up into its monopoly devices long known to the art and hence not themselves subject to any patent.

It is suggested that such a patent should protect the patentee at least against one who knowingly and intentionally builds a device for use in the combination and vends it for that purpose. That is what appears to have been done here. As to ethics, the parties seem to me as much on a parity as the pot and the kettle. But want of knowledge or innocent intent is not ordinarily available to diminish patent protection. I do not see how intent can

make infringement of what otherwise is not. The less legal rights depend on someone's state of mind, the better.

The practical issue is whether we will leave such a combination patent with little value indeed or whether we will give it value by projecting its economic effects to elements not by themselves a part of its legal monopoly. In these circumstances I think we should protect the patent owner in the enjoyment of just what he has been granted—an abstract right in an abstruse combination—worth whatever such a totality may be worth. I see no constitutional or statutory authority for giving it additional value by bringing into its monopoly all or any of the unpatentable parts.

For these reasons I agree with the Court that no case of infringement could have been made out had the issue been raised when it was timely. But I agree with the views of the doctrine of *res adjudicata* expressed by MR. JUSTICE ROBERTS and for that reason join the dissent.